## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :     No. 3:24cr238
                                    :
                                    :     (Judge Munley)
            v.                     :
                                    :
LEO M. HOLLOWAY,               :
                   **Defendant**     :

## MEMORANDUM

Defendant Leo M. Holloway stands accused of trafficking cocaine, heroin, and fentanyl while illegally possessing a Glock 23 semi-automatic pistol. (Doc. 1). Patrol officers from the City of Wilkes-Barre Police Department allegedly recovered these items from Holloway's pickup truck following a traffic stop. The officers obtained a search warrant for Holloway's vehicle after a narcotics detection dog provided a positive alert during an open-air sniff.

Christopher Ward served as the lead officer for the stop. Officer Ward is a member of Luzerne County's Drug Task Force. According to Ward, he received a detailed tip from a confidential source just prior to pulling Holloway's vehicle over. The source told Ward that a black GMC Sierra would be traveling on Hazle Street within the officer's customary patrol zone in the city. The vehicle would have a tinted windshield and a tinted license plate cover. According to the tip,

the vehicle would be operated by a convicted felon named Leo.  Leo would be in possession of a firearm and a large quantity of narcotics.

Shortly after receiving the information from his source, Officer Ward observed a "tinted out" pickup truck on Hazle Street matching the color, make, and model of the vehicle in the source's tip.  Ward then initiated a traffic stop after the vehicle turned onto a residential street.  The driver of the pickup truck was named Leo — the defendant in this case.  According to the government, the truck contained illegal drugs and a handgun, which the defendant was prohibited by law from possessing based on a previous felony conviction.

Before the court is Holloway's motion to suppress. (Doc. 28).  Defendant seeks to suppress the physical evidence obtained after execution of the search warrant as well as the statements he made to police officers during the traffic stop.  Holloway's motion asserts that he is the victim of police misconduct.  According to the defendant's view of the evidence, Officer Ward fabricated the tip to protect his police work from the ruling about to be issued. (See Doc. 36, Def. Reply Br. at 1).

Holloway does not seek to invalidate the search warrant based on the alleged fake tip.  Rather, Holloway asserts an alleged violation of his Fourth Amendment rights during the earliest moments of the traffic stop.  Defendant argues that Officer Ward unreasonably prolonged the stop beyond the vehicle-

tint violations without having the requisite reasonable suspicion to investigate other crimes.  That is, in addition to asserting that Ward made up the tip from the confidential source, Holloway challenges the officer's conduct under Rodriguez v. United States, 575 U.S. 348 (2015) and Third Circuit jurisprudence elaborating upon that decision.

Officer Ward's body-worn camera captured the encounter.  And so Holloway argues: "Unless you don't believe your own eyes and ears in the admitted videos, nothing could be more obvious this was a prolonged off mission event that violated the Fourth Amendment." (Doc. 48, Def. Supp. Br. at 6).

In contrast, the government contends that the vehicle infractions justified the traffic stop and that reasonable suspicion supported Ward's conduct throughout the encounter. (Doc. 49, Gov. Supp. Br. at 2).  Pursuant to Rodriguez, the court must determine the moment that Officer Ward detoured from the ordinary inquiries of a traffic stop to investigate other offenses.  At that moment, Ward needed reasonable suspicion of further criminal activity.  If Ward lacked reasonable suspicion, then Holloway suffered a violation of his Fourth Amendment rights and the pistol, the narcotics, and any incriminating statements offered by the defendant must be precluded as fruit of the poisonous tree. United States v. Curry, No. 22-2501, ---- F.4th ----, 2025 WL 2647753, at *3 (3d Cir. Sept. 16, 2025) (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)) ("Actual

constitutional violations are handled under a single standard: they render both direct and derivative evidence inadmissible.").

## Background[1]

On September 10, 2024, a grand jury in the Middle District of Pennsylvania indicted the defendant on drug trafficking and gun possession offenses. (Doc. 1). Specifically, the indictment charged Holloway as follows:

- Count 1 – possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1); specifically, 40 grams or more of a mixture containing a detectable amount of fentanyl, an unspecified amount of heroin, and an unspecified amount of cocaine;

- Count 2 - possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c); and

- Count 3 - possession of a firearm after being convicted of a crime punishable by imprisonment for a term exceeding one year, i.e., a violation of the felon-in-possession prohibition at 18 U.S.C. § 922(g)(1).

Id.

### 1. The Traffic Stop

The above charges stem from a traffic stop initiated by Christopher Ward on December 26, 2023 as an on-duty patrol officer for the City of Wilkes-Barre Police Department in a zone of the city where he frequently worked. (Doc. 42,

---

[1] These facts are derived solely from the indictment, (Doc. 1), the testimony of the police officers during the suppression hearing on June 4, 2025, (Doc. 42, Hearing Transcript ("H.T.")), and the parties' exhibits from the hearing, (Docs. 43-44), which specifically include video footage captured by Officer Ward's body-worn camera ("Ward BWC"), (Doc. 43, Gov. Ex. #2).

H.T. 35:21-2, 38:6-10, 84:5-8).  Shortly after 3:30 PM, Officer Ward observed a black GMC Sierra pickup truck with a tinted windshield drive by him on Hazle Street. Id. at 44:21-25, 92:16-19.  Ward also observed that the truck had a tinted license plate cover. Id. at 44:21-25.  Ward pulled over the pickup truck on the 300 block of Park Avenue. (Doc. 43, Gov. Ex. #4, Police Incident Report at ECF p. 24).  Ward radioed in the event as a traffic stop for window tint. (Doc. 42, H.T. at 117:1-8).  Another member of the city police department, Officer Joseph Benson, joined Ward in the stop as backup, arriving in a different police department vehicle. Id. at 127:1–129:19.  The court's review of the footage from Officer Ward's body-worn camera reveals the following:

### ***Ward and Benson Approach Holloway's Vehicle***

At the beginning of the interaction with defendant, the video shows that Officer Ward approached the driver's side window of the pickup truck while holding a tint-check meter.[2]  Officer Benson approached the passenger side of the stopped vehicle.  The defendant held his license and vehicle registration document out of the driver's side window.  The vehicle's tinted plate cover can be observed.  Ward greeted the driver, stating "What's up buddy?"  "Sorry for taking so long," Ward apologized, "My radio wasn't working." Earlier footage

---

[2] To reduce the number of citations to Officer Ward's bodycam video in this memorandum, the court will cite to the relevant timestamps at the end of each relevant segment.  The actual interaction between Ward and Holloway begins at 2:15 in the video footage.

corroborates Ward's issues calling in the traffic stop to the county

communications center.

(Doc. 43, Gov. Ex. #2, Ward BWC at 0:29-2:20).

### *Ward Explains the Observed Vehicle Infractions*

Officer Ward stationed himself at the driver's side window with his body

camera positioned on his chest.  Due to the officer's stature and the overall

height of the pickup truck, only the defendant's head and left arm may be

observed in the initial moments of the footage.  While taking the driver's license

and registration card, Ward explained that he stopped the vehicle for the tint

infractions. "The reason I'm pulling you over," he said, "is your window tint, the

windshield, and you got that tinted plate cover."

The defendant replied, "Oh, you can't have it?"

Id. at 2:20-2:25.

### *Ward Asks About Holloway's Home Address and Destination*

Officer Ward then asked, "Where you from?"

"Brookhaven," the driver replied.

Ward, looking over the driver's license and vehicle registration card, asked

(twice), "where's that at?"

"Pennsylvania," the defendant responded, "Brookhaven."

The driver's state-issued license identified him as Leo Madison Holloway, Jr., the defendant in this case.  The defendant's driver's license listed an address for him in Scranton, Pennsylvania.  However, the vehicle's registration card listed an address in Brookhaven, Pennsylvania.

Regarding the Brookhaven address, Officer Ward asked, "What county?"

"Uhh…Chester," Holloway responded. The fingers on defendant's left hand wiggled.

"Oh, like locally," the officer stammered. "Oh, Chester."[3]

Ward then asked the defendant, "Do you have your insurance?"

Officer Ward next inquired into Holloway's travel plans.

He asked, "Where you heading to now?"

In a partly audible response, Holloway replied, "…about to pick my son up."

"Where at?" Ward inquired.  The officer turned his head quickly to his left, looked at someone or something down the street, and turned it just as quickly back to the defendant.

"Scranton," Holloway responded.

Id. at 2:25-2:46.

---

[3] Brookhaven is located in Delaware County, not Chester County.  Brookhaven is a borough adjacent to the City of Chester.  The City of Chester is also located in Delaware County, not Chester County. The particulars of Brookhaven's correct location are clarified shortly thereafter in the exchange.

7

### *Ward Applies the Tint Meter*

Officer Ward then directed Holloway to roll up his driver's side window for a tint check. Before applying the tint meter to the window, the officer explained, "So on a pickup truck like this, you can have these back windows tinted. You cannot have this window or your windshield tinted. All right?"

After a few questions related to insurance, Ward applied the tint meter and provided Holloway with the visible light transmission percentage from the device. "You're measuring 13%. Yeah, way too dark," he said, "...70% of light has to go through the window." Ward's body-worn camera never captured an exterior view of the windshield.

Id. at 2:46-3:11.

### *Ward Asks About Prior Citations*

From that point, Officer Ward approached other topics.

Taking the tint meter off the rolled-up driver's side window, Ward asked, "Have you ever been pulled over before?"

"No, never. Down there they – they don't…" Holloway explained.

During a pause, Ward followed up, "Never been stopped for the window tint?" After Holloway answered in the negative as he rolled his window back down, Ward asked, "You ever been cited for anything?"

8

Ward angled his bodycam in a way where the defendant's head and face are framed by the chrome trim of the window and the top border of the video footage.  Holloway replied: "Nah – not – not for this. No. Never."

During this exchange, Ward can be observed looking down at his reflection on the defendant's door.  He then can be observed pulling the tint-check meter close to his mouth like he was talking into a police radio.  After that gesture, Ward turned his head again abruptly toward the front of the defendant's vehicle as if to look at something or someone down the block.  He then turned his head back to Holloway.

Id. at 3:11-3:20.

### *Ward Asks About Holloway's Arrest Record*

Officer Ward then briefly moved on to questions about defendant's arrest record.

Ward asked, "You ever been arrested before?"

"Huh?" Holloway replied.

Ward asked again in a slightly different way, "You ever have any arrests or anything?"

Holloway's eyes opened wider.  "Yeah, years ago," the defendant responded.

"Years ago," Ward repeated back, "Ok."

9

Defendant's eyes can be observed darting up and down, side to side, straight ahead, and at angles in Ward's general direction as the officer answered a radio transmission.

Id. at 3:20-3:29.

### ***Ward Asks More Questions About Holloway's Address***

The emergency communications operator then reported, "All right, it's all valid, out of – it's giving us Brookhaven.  That's in Delaware County."  During that transmission, Holloway's eyes continued to move quickly, looking forward and to the side in various directions.

Ward then went back to the differing residences listed on Holloway's license and registration card.  He asked the defendant, "What's your address, Brookhaven or Scranton?"

Holloway explained, "No, that's my old address. I moved back... [inaudible over Ward's crosstalk and radio chatter] ... my son still lives here."

Ward then called in Holloway's driver's license number over his radio. Holloway's eyes continued to glance in every direction.  Next, Ward posed more questions about Holloway's address in Brookhaven.

Ward asked, "How far is that from Philly?" turning his head quickly to the left to look down the block again and then back to Holloway.

"It's about 20 minutes," Holloway explained.

10

<u>Id.</u> at 3:25-4:04.

### ***Ward Follows Up on Holloway's Travel Plans***

At this point, Officer Ward repositioned himself in a manner where the defendant cannot be observed in the supplied footage. For the next several minutes, Holloway's responses are muffled or muted by traffic noise and radio chatter.

Ward turned back to questions about Holloway's travels. He asked, "Where you coming from right now?"

"I'm coming from an auto shop," Holloway responded.

"Oh," Ward continued, "Which one?"

Holloway's response is inaudible due to radio chatter.

Ward asked, "Where's that at?"

"In Sugar Notch," Holloway explained.[4]

<u>Id.</u> at 4:09-4:18.

### ***Ward Follows Up on Holloway's Criminal History***

Following the above questions, Officer Ward returned to questioning about defendant's criminal history. Ward asked, "When was the last time you got arrested?"

"2014," Holloway replied. "Oh, wow," the officer remarked.

---

[4] Sugar Notch is a borough located to the southwest of Wilkes-Barre's city limits.

Ward followed up, "Did you do state time or anything?" Holloway did not immediately answer.

"Or county time?" Ward asked.

"It was a violation," said the defendant.

"Oh, for like probation?" Ward replied.

Talking over the officer, Holloway stated, "I had a DUI years ago."

During the above exchange, the comm-center operator radioed to Ward, "Ok, on Holloway, it's all valid." Ward then shifted to another topic. Id. at 4:18-4:44.

### *Ward Asks About Weapons and Contraband in the Vehicle*

After a brief pause, Officer Ward's lips moved before he began to resume his questions. Many of Holloway's responses are inaudible or possibly non-verbal. The following exchange is discernable from the footage provided to the court:

**Ward:**      You have any weapons, any knives in the car?
Any firearms?
Nothing?
Nothing illegal?
Any marijuana?

**Holloway:**   No. I don't smoke.

| **Ward:** | No? |
| | Do you smoke cigarettes or anything like that? |
| | Do you have any drugs in the vehicle? |
| | Will you consent to a search of the vehicle? |
| | |
| **Holloway:** | No, I will not. |
| | |
| **Ward:** | Ok. |

Based on what follows, the defendant did not answer yes to any of the above questions about weapons, knives, firearms, illegal items, or drugs. Id. at 4:47-5:06.

### ***Ward Returns to Holloway's Travel Plans***

After asking for and then writing down Holloway's phone number, Officer Ward circled back to an earlier topic, Holloway's travel plans. He probed, "So you live in Brookhaven, but you're coming to pick your kid up from Scranton?"

During Holloway's response, which started with a yes, Ward muttered something quickly. Holloway's full response is muffled.

Whatever the utterances were at that moment, the officer sought clarification, "Oh, you're picking him up from school, you said?"

"He's in daycare now," Holloway replied, "I'm getting him from his mom."

Defendant continued, "He's in daycare right now."

13

"What daycare?"  Ward quizzed.

As he finished the question, Officer Ward snapped his head to the left to look down the block again, his image reflected by the paint finish on the defendant's vehicle.

As Holloway identified a daycare in Scranton, Ward turned his head back to look at the defendant.

Id. at 4:47-5:32.

### Ward Probes Further

The officer kept at Holloway's travel plans.  He asked, "So you're heading right to Scranton now and then taking him to his mom's?"

"No," defendant replied, "[inaudible]…coming back home."

"Oh, is it a joint custody thing?" Ward inquired.  Holloway provided an answer, but a van and a pickup truck drove past behind the officer.  The vehicle noise drowned out Holloway's response in the footage.

Ward asked, "How old is your son?"

Another passing vehicle muffled the defendant's answer.

Id. at 5:32-5:45.

### ***Ward Raises the Issue of Holloway Acting Nervous***

Officer Ward next asked a declarative question, like those asked before: "You have nothing illegal in the car?" Like the above segments, Holloway's response cannot be overheard on the bodycam audio.

Whatever Holloway said caused Ward to raise his head and glare at the defendant, as observed in the officer's reflection from defendant's driver's side door.  Subsequently, Ward retorted, "No, I'm asking. Well, you're shaking real bad. You're nervous."

Ward tremored his right hand to demonstrate.

Holloway stressed to the officer, loud and clear, "I'm not shaking. I'm a diabetic. I'm not shaking. I'm just wondering what's going on."

The squabble continued.  Officer Ward said to the defendant, "Well, I told you…I pulled…I'm asking for where you're going." Holloway can be heard making a noise that sounds like a laugh.

Ward continued: "Yeah, I can ask that on a traffic stop. It's just a traffic. I mean, if you have something to be concerned about – "

Holloway interjected, "No, I don't. I'm trying to pick up my son… [inaudible] … Brookhaven."

Id. at 5:45-6:15.

### *Ward Circles Back to Prior Topics*

Ward then revisited more topics.

He asked: "How far is Brookhaven? How long does it take you to get there?" Holloway's response is inaudible.

Ward quickly shifted gears back to Holloway's answers to earlier questions about his interactions with the criminal justice system.  He used another declarative question, "And your last arrest was in 2014?"

The audible portion of Holloway's answer concludes with the words "about two hours."

Ward asked again, "You said your last arrest was in 2014?"

Holloway answered "Yes," and then stated, after a pause, "Two hours."

Ward had turned his body away again as if to look at something else down the block.

Id. at 6:15-6:37.

### *Ward Asks for Additional Details About Holloway's Plans*

Holloway's reference to "two hours" caused Officer Ward to shift back to the driver's side window and lean in, "What's that? I'm sorry."

Holloway responded again, "Two hours."

Ward inquired, "You have work tonight?"  Holloway's responses are muffled throughout this exchange.

16

Ward then responded to something the defendant said, "No, I'm asking do you have work tonight? I didn't know if you had to be back by a certain time."

Holloway's response was somewhat clearer. "Oh, no," he said, "I mean, I've got my son. I've got [inaudible]."

Id. at 6:37-6:50.

### Ward Asks Holloway Whether He Knows the Bystanders

Officer Ward was about finished. "I gotcha," he said, "What do you take the turnpike?"

Holloway responded affirmatively and continued speaking, but his words are not clear on the bodycam audio.

Ward turned his head to look down the block once again. He asked Holloway directly, "You don't know these guys?"

Based on Ward's response, Holloway answered in the negative.

Ward then wrapped up this portion of the questioning. "All right," he said to Holloway, "Will you do me a favor? Hang out for one second."

The officer then returned to his patrol car.

Id. at 6:50-7:10.

### Ward Searches Holloway's Criminal History

Once inside the car, Ward radioed for the availability of a narcotics detection dog. While waiting for further information, Ward began typing on his

17

laptop.  He offered a monologue to his bodycam: "Something doesn't add up with this guy.  Nervous wreck. Saying he's going to get his kid in Scranton. Very, very nervous."

The information appearing on Ward's laptop screen is blurry in the video provided to the court.

Ward, however, continued to narrate, "He's got PWIs on his record. Department of Corrections, 2019, parole board.  False ID to law enforcement. Possession of. Possession of. Possession of. 2018, he has a PWI."

Id. at 7:10-9:50.

### ***Ward Orders Holloway Out of the Vehicle Pending a Canine Sniff***

Ward returned to Holloway in the pickup truck.  The following exchange then occurred:

|  |  |
|---|---|
| **Ward:** | Hey, you have an arrest way prior to 4 years ago. |
| **Holloway:** | I thought it was a DUI. It wasn't an arrest. It was a violation. |
| **Ward:** | Were you on state parole or federal? |
| **Holloway:** | I was on state. |
| **Ward:** | You got violated for your DUI? |
| **Holloway:** | Yeah. [inaudible] |
| **Ward:** | You beat it? |

| Holloway: | Yes. |
| Ward: | Is your license good? |
| Holloway: | Yes. |

Ward turned away to listen to a transmission over his radio. Ward started back toward the window, stating, "All right, here's the deal. In the state of Pennsylvania…"

But Ward then stopped himself. He directed Holloway to exit the vehicle. Defendant objected to Ward's request. Holloway and Ward engaged in a back-and-forth exchange about exiting the vehicle. At the end of this back-and-forth, Holloway stepped out of the vehicle and Ward patted him down. Ward and Holloway moved to the rear of the pickup truck where Officer Benson had joined them.

Ward started into an explanation, "I believe there's something illegal in your vehicle, i.e., drugs…." What follows in the bodycam footage will be discussed where relevant below.

Approximately sixteen minutes later, a narcotics detection dog named Zeus arrived with his handler, Sergeant Ruddy Navarro of the Pittston Township Police Department. Zeus performed an open-air sniff around the vehicle. Navarro advised Officer Ward that Zeus provided a positive alert. Ward and Navarro continued to engage Holloway in conversation. Several minutes after that, Ward

19

informed Holloway that he was free to leave the scene pending impoundment of the vehicle and application for a search warrant. Holloway departed in the direction down the street where Ward had been focusing his attention at the onlookers.

Officer Ward, Officer Benson, and Sergeant Navarro permitted Holloway to leave the scene with a rubber-banded stack of currency which, earlier, the defendant had pulled from his front left pants pocket and identified as "$4,300." Id. at 9:50-11:27, 17:55-18:29, 27:31-31:23, 37:53-38:40.

### 2. The Tip

After Holloway's departure, but while still on scene, Officer Ward spoke with an assistant district attorney to discuss a search warrant for Holloway's vehicle. Ward advised, in relevant part:

> I had a confidential informant reach out to me that there's gonna be a black GMC all tinted out driving down Hazle Street, with a significant amount of narcotics in the vehicle. I observed the vehicle, its window, front windshield's tinted, uh, illegal tint on driver passenger front door and also tinted out plate cover. I initiated a traffic stop…

Then, in response to an unknown question from the county prosecutor, Ward stated, "Yeah, and I have a…very reliable CI that has provided accurate information in the past." Ward eventually departed the scene, preparing search warrant documents on the laptop in his vehicle as he drove behind the tow truck. Id. at 41:07-42:26, 47:28-1:01:06.

Regarding the tip, Ward's affidavit of probable case provides, in relevant part:

> *2) On 06/18/2023 at approximately 1430 hours, I, Officer Christopher Ward, received information from a creditable source that Black GMC Sierra with a tinted windshield and a tinted plate cover, would be driving in the area of Hazle Street. The source informed that this vehicle, would be operated a convicted felon, named Leo, who was in possession of a firearm and a large some of narcotics. This specific source has provide reliable/credible information in the past.*

(Doc. 43, Gov. Ex. 1. at ECF p. 3) (as submitted).

At the hearing on defendant's suppression motion, Ward testified that his affidavit of probable cause contains an error related to the date of the tip based on his neglect, i.e. failing to delete information from a prior search warrant that he used as a template. (Doc. 42, H.T. 71:4–72:4). According to Ward, he received the tip here on December 26, 2023 at some point between 2:00 PM, the start of his shift, and 3:30 PM, the time of the traffic stop. Id. at 43:11-23. Ward also testified that the tip included information that the driver of the vehicle would be from the Philadelphia area. Id. at 49:8-12.

According to Officer Benson, the backup officer, Ward informed him of the tip via a phone call made prior to the traffic stop. Id. at 128:7-13. Benson testified: "[H]e advised me that there was information from an informant that the

vehicle was coming through, and if he was to stop the vehicle, to assist him, because there was…guns and drugs in the vehicle." Id.

Ward, however, did not directly relay the tip to Sergeant Navarro, who arrived on scene with the narcotics dog. Id. at 105:1-7. Ward did however advise Navarro that the defendant appeared to be a "nervous wreck when ask[ed] questions about guns/drugs in the car." (Doc. 43, Gov. Ex. #2, Ward BWC, 27:54–28:10).

### 3. Execution of the Search Warrant

Holloway's pickup truck would not fit inside the police department parking garage when loaded on a flatbed tow truck. Id. at 100:20-1:00:46. The officers thus secured the vehicle at a facility owned by a private towing company pending approval of the search warrant. (Doc. 43, Gov. Ex. #1. at ECF p. 4). According to the officer's affidavit of probable cause, between the time of the traffic stop and his application for the search warrant later that day, Ward received information that an unknown black male in a ski mask approached one of the tow operator's employees and specifically asked that employee to remove a firearm and drugs from the center console of the vehicle. Id.

At 7:05 PM that same day, Magisterial District Judge James M. Dixon approved the search warrant. Id. at ECF p. 2. Upon execution of the warrant at 7:30 PM, Officers Ward and Benson recovered a Glock 23 .40 caliber semi-

automatic pistol from the locked glovebox and a nylon pouch from the floor behind the passenger seat. (Doc. 43, Gov. Ex. 4. at ECF p. 25). After officers cut open the pouch, they discovered the following: 1) three plastic bags of suspected crack cocaine with an estimated weight of 106 grams; 2) two plastic bags of a brown powder suspected to be heroin or fentanyl with an estimated weight of 89.9 grams; 3) two digital scales; and 4) numerous empty plastic bags. Id.

### 4. Holloway's Motion to Suppress and Subsequent Proceedings

Following his indictment on federal charges, Holloway filed the instant motion to suppress. (Doc. 28). Defendant seeks to suppress statements made during the traffic stop and all physical evidence derived from the encounter. See id. at 4. The government opposes, relying upon the tip as a ground for Ward's reasonable suspicion. (Doc. 31). As mentioned above, Holloway's reply brief argues that Ward fabricated the tip. (Doc. 36).

The court held an evidentiary hearing on June 4, 2025, where Officer Ward, Officer Benson, and Sergeant Navarro all testified. (Doc. 42). Following the filing of the hearing transcript, the parties submitted post-hearing briefs in lieu of closing arguments. (Docs. 45-46).

While initially under advisement, the Third Circuit Court of Appeals issued a precedential decision in United States v. Ross, 151 F.4th 487 (2025), which clarified Rodriguez and elaborated upon the four categories of officer questioning

23

from appellate case law. Consequently, given the questions asked by Officer

Ward on scene, and the defendant's position that "the informant is bogus," (Doc.

42, H.T. 130:8-12), the court directed the parties to file supplemental briefs

addressing the <u>Ross</u> categories as applied to the record in this case, (Doc. 47).

Thereafter, the parties' each filed supplemental briefs in accordance with that

order. (Docs. 48–49).

**Analysis**

**1. The Basis for the Traffic Stop**

The Fourth Amendment of the United States Constitution protects "[t]he

right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures[.]" U.S. CONST. AMEND. IV. A traffic

stop is a seizure within the meaning of the Fourth Amendment. <u>United States v.</u>

<u>Delfin-Colina</u>, 464 F.3d 392, 397 (3d Cir. 2006). "Such a seizure does not violate

the Fourth Amendment, however, if it is reasonable." <u>United States v. Hurtt</u>, 31

F.4th 152, 158 (3d Cir. 2022) (citing <u>Whren v. United States</u>, 517 U.S. 806, 810

(1996); <u>see also</u> <u>Florida v. Jimeno</u>, 500 U.S. 248, 250 (1991) (citation omitted)

("The touchstone of the Fourth Amendment is reasonableness.").

"Generally, for a seizure to be reasonable under the Fourth Amendment, it

must be effectuated with a warrant based on probable cause." <u>United States v.</u>

<u>Robertson</u>, 305 F.3d 164, 167 (3d Cir. 2002) (citing <u>Katz v. United States</u>, 389

24

U.S. 347, 356–57 (1967)). "Warrantless…seizures are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies." United States v. Bey, 911 F.3d 139, 145 (3d Cir. 2018) (citing California v. Acevedo, 500 U.S. 565, 580 (1991)).

Pursuant to the Pennsylvania Vehicle Code, "[i]t is unlawful to display on any vehicle a registration plate which…has a tinted plate cover." 75 PA. CONS. STAT. § 1332(b)(5).  Under the text of the Vehicle Code, for that infraction to rise to a summary offense, the tinted cover must obscure the plate as to inhibit the operation of an automated red light enforcement system or electronic toll collection system or inhibit "the visibility of the issuing jurisdiction at a reasonable distance." 75 PA. CONS. STAT. § 1332(c) (referencing broader obstructed plate prohibitions at 75 PA. CONS. STAT. § 1332(b)(2), (b)(4)).  Another Vehicle Code provision provides: "No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle." 75 PA. CONS. STAT. § 4524(e)(1).

One "well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop [i.e., a Terry stop] when the officer has a reasonable, articulable suspicion that criminal

activity is afoot.' " <u>United States v. Lewis</u>, 672 F.3d 232, 237 (3d Cir. 2012) (quoting <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000)); <u>see also</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 27, 30–31 (1968)).  Although <u>Terry</u> dealt with the stop and frisk of individuals, that exception "applies with equal force to a traffic stop of a vehicle." <u>Id.</u>; <u>see also</u> <u>Delfin-Colina</u>, 464 F.3d at 397 ("the <u>Terry</u> reasonable suspicion standard applies to routine traffic stops.").  The Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops, not probable cause. <u>See</u> <u>Delfin-Colina</u>, 464 F.3d at 397.

In this case, Ward testified that he observed a black GMC Sierra pickup truck with a tinted windshield, tinted front windows, and a tinted plate cover. (Doc. 42, H.T. 44:21-25).   He explained at the hearing, however, that he "wanted to conduct a drug interdiction stop with the information…that there was possible drugs and a firearm inside the vehicle." (Doc. 42, H.T. 45:13-19).  He testified: "That was my purpose of the stop. My initial reason -- or my reason was the Vehicle Code violations of the tinted windshield and the plate cover." <u>Id.</u>

The court disregards Officer Ward's stated reasons.  "Courts must review reasonableness through an objective lens…and should not consider the actual or subjective intentions of the officer involved." <u>United States v. Hunter</u>, 88 F.4th 221, 224 (3d Cir. 2023) (citing <u>Ohio v. Robinette</u>, 519 U.S. 33, 39 (1996); <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996)).  Under the law, "any technical

violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006).  Observation of the tinted plate cover supplied Ward with enough objective reasonable suspicion to initiate the traffic stop.  The court need not consider whether Ward had independent reasonable suspicion to pull Holloway over based on the tip.[5]  See Adams v. Williams, 407 U.S. 143, 147 (1972) (holding that an informant's unverified tip carried enough "indicia of reliability" to support a Terry stop even if it was insufficient for a narcotics arrest or search warrant).  Under Rodriguez, the tolerable duration of a traffic stop "is determined by the seizure's 'mission,' – to address the traffic violation that warranted the stop[.]"  575 U.S. at 354.  Under the law, Ward initiated a traffic stop because of observed unlawful vehicle tint.  Vehicle tint was his mission.

Pursuant to Rodriguez, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  575 U.S. at 350.  Thus, "[a] seizure justified only by a police-observed traffic violation… 'become[s] unlawful if it is prolonged beyond

---

[5] "When a Terry stop is based on a tip provided by an informant," such as in the context of a traffic stop, the court "must scrutinize the informant's 'veracity, reliability, and basis of knowledge' to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop." United States v. Johnson, 592 F.3d 442, 449 (3d Cir. 2010) (citing Alabama v. White, 496 U.S. 325, 328 (1990); United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2008)).  These matters will be considered when discussing whether Officer Ward had reasonable suspicion to prolong the traffic stop to investigate other crimes.

the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." Id. at 350–51 (quoting Illinois v. Cabales, 543 U.S. 405, 407 (2005)). "An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." United States v. Green, 897 F.3d 173, 179 (3d Cir. 2018) (citing Rodriguez, 575 U.S. at 355–56).  According to the defendant, Ward lacked reasonable suspicion to investigate beyond the vehicle tint violations. (Doc. 28 ¶ 24).

The government counters that Ward had reasonable suspicion based, in part, on the tip from his confidential source.  Holloway accuses Ward of fabricating the tip. (Doc. 42, H.T. at 113:15-16).

The reasonable suspicion determination is based on "the totality of the circumstances—the whole picture." United States v. Sokolow, 490 U.S. 1, 8 (1989).  Ward's veracity is thus a threshold issue.[6]

---

[6] A defendant who seeks to suppress evidence from a claimed Fourth Amendment violation bears the initial burden of establishing a basis for his motion. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted).  Once the defendant establishes a basis for his motion, the "burden shifts to the government to show that the search or seizure was reasonable." Id.; see also United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009) ("the Fourth Amendment does not prohibit all searches—only those that are unreasonable.") (additional citation omitted).  The government must then prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005); see also United States v. Matlock, 415 U.S. 164, 178, n. 14 (1974).

### 2. Ward's Truthfulness About the Tip

On a motion to suppress evidence, the trial court sits as the factfinder and determines the credibility of witnesses. See United States v. Harris, 507 F.2d 197, 198 (3d Cir. 1975); Gov't of Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir. 1974), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009) ("credibility determinations are uniquely the province of the fact-finder"); see also United States v. Thompson, No. CR 15-CR-222, 2015 WL 5159180, at *4 (E.D. Pa. Sept. 2, 2015) (Restrepo, J.).[7]  In this role, "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S. Ct. 1504, 1512, 84 L. Ed. 2d 518 (1985).  However, "factors other than demeanor and inflection [also] go into the decision whether or not to believe a witness." Id.  "Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." Id.

---

[7] In Harris, the Third Circuit Court of Appeals affirmed an order of suppression where a district court judge found the testimony of a seventeen-year-old to be more credible than the testimony of FBI agents. 507 F.2d at 198.  The district court judge expressed that decision about witness credibility using a "laconic pronouncement." Id. Despite affirmance, the Third Circuit emphasized the great responsibility district courts possess in reaching credibility decisions which may remove a prosecution from the guilt-finding process. Id.

Holloway asserts that Ward's explanations about the tip are far-fetched attempts to justify an otherwise illegal prolonged detention.  In deciding a witness's credibility, jurors sitting in criminal cases are instructed to use their common sense, good judgment, and experience.  Mod. Crim. Jury Instr. 3rd Cir. 1.10 (2024).  This common-sense test is supplemented by an instruction on various credibility factors:

> (1) The opportunity and ability of the witness to see or hear or know the things about which the witness testifies; (2) The quality of the witness knowledge, understanding, and memory; (3) The witness appearance, behavior, and manner while testifying; (4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; (5) Any relation the witness may have with a party in the case and any effect that the verdict may have on the witness; (6) Whether the witness said or wrote anything before trial that is different from the witness testimony in court; (7) Whether the witness testimony is consistent or inconsistent with other evidence that you believe [or how believable the witness testimony is when considered with other evidence that you believe]; (8) Any other factors that bear on whether the witness should be believed…

Id.

As an initial matter, Ward works for a municipal police department. "[T]he testimony of a witness is not to be judged more or less credible because the witness is a law enforcement officer." United States v. Murphy, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citing United States v. Bethancourt, 65 F.3d 1074, 1080 (3d Cir. 1995); United States v. Conley, 859 F.Supp. 830, 840 (W.D. Pa.

1994).  Ward is also a government witness. "Government witnesses are not *per se* credible, or even presumed to be credible." <u>Conley</u>, 859 F. Supp. at 840.

On the other side, Holloway stands accused of serious offenses.  His constitutional right to due process of law affords him the presumption of innocence. <u>Coffin v. United States</u>, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.").  He also has a Fifth Amendment privilege against self-incrimination and need not testify at a suppression hearing. <u>See</u> <u>Simmons v. United States</u>, 390 U.S. 377, 393–94 (1968). Thus, in weighing Ward's credibility at the suppression hearing, the undersigned disregards any differences between the officer and the defendant based on their roles, where they sat in the courtroom or how they departed.  Using some of the jury instructions for organization, the court assesses Officer Ward's credibility as follows:

*Witness Appearance, Behavior, and Manner While Testifying*.  Officer Ward testified for over two hours during the suppression hearing.  The court had the opportunity to hear the substance of his answers on direct and cross-examination, appreciate the tenor of his responses, and observe his body language and demeanor.  Nothing in Ward's answers or the way he responded to

the questions suggested untruthfulness about the tip.  Ward did not respond

defensively to questions on cross-examination in any manner the court would

find noteworthy.  He did not display any animus toward Holloway or his counsel

during the hearing.

   *The Opportunity and Ability of the Witness to See or Hear or Know the*

*Things About Which the Witness Testifies.*  Regarding the tip itself, Officer Ward

offered significant information about his source without explicitly revealing that

person's identity.  According to Ward, he had been introduced to the source by a

retiring colleague in the force who had used that individual for information. (Doc.

42, H.T. at 40:4-10).  That colleague had withheld the existence and identity of

the source from Ward during the two years they worked together. Id. 41:8-11.

Ward, however, had known the individual through his "professional career." Id.

80:16-21.  Upon learning this person's identity, Ward expressed some level of

shock that this person "was willing to provide information…and be a reliable

source." Id. 80:16-21.  That source then started providing Ward with sporadic

information, but the officer admitted that he sometimes could not follow-up on the

tips provided. Id. 78:12–80:15, 122:9–20.

   Approximately one month before the tip provided in this case, Ward's

source supplied information to him about a fatal shooting at an adult

entertainment club. Id. at 41:22–42:8.  According to Ward, he relayed that

information to the Pennsylvania State Police, who were handling the investigation in a separate jurisdiction. Id.  The source gave a direct account of the entire incident, particular details about what led to the shooting, and information to aid in identifying "key individuals." Id.  Ward testified that the identities of these individuals were confirmed using surveillance video. Id.

Ward also testified that he would use this source to aid with identifying suspects in other matters.  Specifically, he would send this source a "still image," and would receive information about individuals in the picture.  Id. at 80:10-15.

Ward shared sufficient details about the confidential source for the court to proceed without speculation.  The individual is not a police officer.  This individual would be familiar to officers of the Wilkes-Barre Police Department, but that individual was not a "historical criminal." Id. at 80:22–81:6.  This individual was either present at the scene of a notorious shooting or closely affiliated with those involved.  It is thus reasonable to infer that this source would be at risk of being harmed or even killed by his associates or affiliates if they knew he had such a relationship with Officer Ward or his retired colleague before him.

On the other hand, Ward could not recall whether he received the specific tip at issue by text message or by phone call. Id. at 81:11–83:19.  According to the officer, any forensic evidence from his cellphone had been lost in a software update. Id.  Ward also did not write any details down about the tip.  Id. at 88:5–

33

90:3.  Nonetheless, such testimony does not establish that Ward made up a tip from a confidential source.  As Ward testified, he received the tip and initiated a traffic stop less than two hours into his shift on December 26, 2023.  By the end of that shift, he had spelled out the tip in an affidavit of probable cause for a search warrant and obtained that warrant.  Ward's memory is sufficient.  See id.

*Whether the Witness Testimony is Consistent or Inconsistent with Other Evidence that the Court Believes.*  Turning to Ward's bodycam footage, the parties highlighted certain portions of video evidence during their examination of witnesses.  After the hearing, the court reviewed the entire video provided by the government.

According to Holloway, "the actions in this incident are very clear due to different activated videos at the scene."[8] (Doc. 45, Post-Hearing Br. at 2).  The government says that the video, "speaks for itself." (Doc. 46, Post-Hearing Br. at 1, 3).   In the court's experience, however, such technology comes with limitations. From a technical standpoint, body-worn cameras do not produce cinematic quality video or audio.  Bodycams provide a limited range of view from the upper abdomen of an officer.  Based on where these cameras are typically worn, a viewer cannot see at eye-level.  The officer's hands or other positioning

---

[8] The parties did not supply footage other than that from Ward's bodycam.

can block the camera's view.  The placement of microphones leads to audio limitations.  Obstructions can occur at critical moments during a police encounter.

Also, bodycam footage does not aid in understanding officer perception.  A viewer cannot see what an officer perceives.  A viewer may also see something that an officer does not see or perceive in that moment.

The court typically reviews bodycam footage under circumstances where a civil plaintiff or a criminal defendant asserts a violation of their constitutional rights by the police.  Body-worn cameras are police department issued.  They do not focus on the officers alleged of violating those rights.  During police encounters, it is difficult to observe what an officer is doing unless another officer is also equipped similarly and positioned appropriately.  That leads to more attention placed on a civil plaintiff or criminal defendant's actions or statements, not the officer.   Body-worn cameras also allow officers to become narrators during their encounters.

The court considered the above when reviewing Ward's bodycam footage.  As discussed in the background section of this memorandum, the footage does not capture the totality of Ward's interactions with Holloway or everything defendant said on scene.  Holloway cannot be fully observed until he steps out of the vehicle.  Thus, the bodycam fails to capture all the defendant's movements and responses during the initial moments of the traffic stop when the Rodriguez

moment occurred — more on that later.  On the other hand, Ward's reflection from the truck is visible during those initial moments at the driver's side door. The ability to observe Ward's body-language during this encounter is important for assessing credibility and proceeding with the requisite Rodriguez inquiries.

The court begins addressing Ward's statements on bodycam about Holloway shaking as the questioning unfolded and the encounter escalated from vehicle infractions to drug interdiction.  Specifically, one of Holloway's main challenges to Officer Ward's veracity is the officer's repeated testimonials to the defendant that he was acting nervous or shaking during the traffic stop.  In the bodycam footage, Ward told Holloway that he was shaking or acting nervous on several different occasions.[9]  (See e.g., Doc. 43, Gov. Ex. 2, Ward BWC at 5:32-5:45, 16:14-16:24, 19:08-19:42).  Ward relayed to Sergeant Navarro, the drug canine handler, that Holloway was a "nervous wreck" when asked about drugs and guns in the car.  Id. 27:50-28:10.  Ward used that same descriptor when discussing his search warrant application with a county assistant district attorney over the phone.  Id. at 41:07-41:58.  Ward also told the ADA that Holloway was "absolutely shaking."  Id.  In essence, defendant argues that Ward's narration lacks credibility on video replay.

---

[9] "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

The following portion of Ward's cross-examination is reflective of many similar questions:

> Q.   I'll ask you. You watched your video, sir?
>
> A.   Yes, I did.
>
> Q.   Fifty-some minutes long?
>
> A.   Yes.
>
> Q.   Did you ever see him uncontrollably shaking in that video? Tell me if you did.
>
> A.   I can't attest to what time it was, I'm sure he was shaking.
>
> Q.   Are you telling this Court, under oath, that there's a point in this video that we can watch and that you can come down and examine that shows him uncontrollably shaking? Are you telling us that under oath?
>
> A.   Yes, if I'm documenting it in my video.
>
> [Defense counsel]: Okay, well, I will ask the Court to watch the entire video and make their own decisions about that.

(Doc. 42, H.T. at 97:3-18).  Ward's cross-examination also featured a review of four other unrelated search warrants where the officer had indicated that other suspects were shaking. Id. 113:20–114:16; see also Doc. 44, Def. Ex. A-D.

To drive home an argument that Holloway cannot be observed shaking in the bodycam footage, Ward's cross-examination included questions about a

segment of bodycam footage where the officer told Holloway: "Man, I'll be honest, you're still pretty nervous the way you're acting." (Doc. 42, H.T. at 113:20-116:17 (referencing the timestamp 16:20 in the bodycam footage)). In this snippet of video, Holloway can be observed leaning on the truck's bed cover with his left armpit and his left hand resting on his head. (Doc. 43, Gov. Ex. #2, Ward BWC at 16:17-16:25). Defense argues that Holloway's eyes, posture, and physical response to that statement indicate that he is tired and/or aggravated, not nervously shaking.

In adjacent portions of the footage, however, Holloway's left hand does not know what his right hand is doing. Going back a few seconds from the 16:20 mark, Holloway's right hand can be observed trembling as he holds his cellphone. Id. at 16:04-16:16.

To rule out any distortive effect from Ward's own motion, the court reviewed other segments of video where the officer and Holloway are standing near each other outside the vehicle. In certain segments, Holloway's right hand can be observed shaking, at least when the defendant stops gesturing with that arm or is not making or taking calls on his phone. Id. at 11:39-12:12. As for Holloway's left hand, it also can be observed shaking in other segments of the video. Id. at 18:25-19:06. The defendant appears to shift that hand to his head when it begins to move involuntarily. Id.

38

Holloway's hands can also be observed shaking when he moves credit cards around in his wallet after consenting to a search of that item. Id. 19:23-19:30.  Officer Ward responded to those movements by telling the defendant: "Dude, you see you're shaking real bad." Id.  In reply, Holloway advised Ward about a Type 2 diabetes diagnosis and remarked that he had not eaten that day. Id. at 19:30-19:47.  Holloway also yawned, perhaps on purpose, and returned his cellphone to his ear with his right hand, shifting his left hand to the top of his head. Id.  Nevertheless, defendant's right hand can be observed continuing to shake in this portion of the footage. Id.

Moreover, in the above video segments where Ward directly confronted Holloway about his nervousness on scene, defendant tacitly admitted such movements by referencing a diabetes diagnosis, emphasizing his fatigue, and changing his body posture and hand placement.  Ward's bodycam captures defendant's efforts. Ward further testified about Holloway's other perceived nervous cues, such as touching his head and face, avoiding eye contact, looking around, and using his phone. (Doc. 42, H.T. 60:6-16, 115:2-23). These movements are also able to be observed in the bodycam footage.  Specifically, the court observed Holloway's eyes widening and darting around when Officer Ward started asking the defendant about his arrest history, approximately one

minute into their face-to-face discussion. (Doc. 43, Gov. Ex. #2, Ward BWC at 3:20-3:29).

In this case, there is no dispute that Officer Ward acted as a narrator at times during his interactions with Holloway.  He testified as such at the hearing. (Doc. 42, H.T. at 57:3-15).   After watching the bodycam footage, however, the court concludes that Ward's statements about Holloway's nervousness and shaking are supported by the evidence. [10]  Ward is a reliable narrator in this instance.  Consequently, the officer's narrative about defendant's on-scene behavior is truthful.  This method of challenging Ward's veracity about the tip lacks any force.

*Whether the Witness Said or Wrote Anything Before Trial that is Different from the Witness Testimony in Court.*  Turning to evidentiary inconsistencies, Ward admitted to two errors in his affidavit of probable cause at the hearing. First, Ward acknowledged that he listed events from the traffic stop out of order. (Doc. 42, H.T. 72:17-20, 102:12-18).  Second, Ward testified that his affidavit

---

[10] Holloway also challenges Ward's credibility by referencing a portion of video eight minutes into the stop where Ward is conducting a criminal background check in his vehicle. In that segment, Ward mused: "Something doesn't add up with this guy.  Nervous wreck. Saying he's going to get his kid in Scranton. Very, very nervous." (Doc. 43, Gov. Ex. #2, Ward BWC 7:50-8:10).  Defendant argues that this "is simply not the real time comments of an officer already armed with credible information of felon, drugs and guns." (Doc. 45, Post-Hearing Br. at 6).  At the hearing, Ward testified, in essence, that he was confirming that the tip was checking out and reassuring himself that he had to move forward. (Doc. 42, H.T. at 57:3-15, 102:23–104:12).  Given the context of the traffic stop up to that point, Ward's explanation is believable.

included the wrong date as to when he received the tip.  Id. at 71:8–72:4,

110:22–113:19.  As to these inconsistencies, Ward explained that he copy-and-

pasted information into his warrants, such as details about his training. Id. 111:4-

10.  He also testified that he may have neglected to remove items from a

previous search warrant.  Id. at 71:11–72:4.

Regarding this ostensible copy-paste error or failure to remove his or

another officer's information from a warrant template, "[a] policeman's affidavit

should not be judged as an entry in an essay contest." United States v. Harris,

403 U.S. 573, 579 (1971) (citation and internal quotation marks omitted).  After

all, affidavits "are normally drafted by nonlawyers in the midst and haste of a

criminal investigation." Illinois v. Gates, 462 U.S. 213, 235 (1983) (quoting United

States v. Ventresca, 380 U.S. 102, 108 (1965)).  Inaccuracies in an affidavit of

probable cause do not necessarily support an inference that a police officer was

deliberately untruthful. See United States v. Brown, 3 F.3d 673, 678 (3d Cir.

1993).  Rather, "the Fourth Amendment allows for some mistakes on the part of

government officials, giving them 'fair leeway for enforcing the law in the

community's protection.' " Heien v. North Carolina, 574 U.S. 54, 60–61 (2014)

(quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)).

In the bodycam footage, Ward can be observed attempting to complete his work in short order.  Specifically, Ward began preparing his warrant application forms while waiting for the tow truck in his police car.  (Doc. 43, Gov. Ex. #2, Ward BWC at 48:27-58:20).  He also continued preparing these documents as he followed the tow truck back to police headquarters. Id. A prior completed affidavit of probable cause is clearly visible in this portion of the bodycam footage for almost thirty seconds. Id. 48:27-48:50.  At the suppression hearing, Ward owned the above-described mistakes in his affidavit and his explanations were reasonable given the fast pace of the investigation from tip to search warrant, a period of approximately five hours.  Consequently, Holloway has only proven that Officer Ward submitted an affidavit of probable cause with an incorrect date as to when he received the tip, not that the officer fabricated the tip itself.[11]

*Other Credibility Considerations.* Holloway raises one more challenge to Ward's credibility in attacking the genuineness of the tip.  Specifically, Holloway argues that "[e]verything a reasonable officer would have done faced with credible information of stopping a known felon with a gun was NOT done by Officer Ward - actions speak louder than words." (Doc. 45., Post-Hearing Br. at

---

[11] Ward added one detail to the tip during his testimony that is not contained within his affidavit of probable cause.  Specifically, Ward testified that he received information that the driver would be from the Philadelphia area.  (Doc. 42, H.T. 49:10-12, 50:12-18, 90:24–91:5).  The affidavit of probable cause does not mention that element of the tip. (Doc. 43, Gov. Ex. #1 at ECF p. 1).  To be clear, this omission does not lead the court to conclude that the tip was fabricated.  Neither side asked Ward about this discrepancy during the hearing.

4).  This argument focuses on Ward's approach to Holloway's vehicle, i.e.,
walking directly to the driver's side of the pickup truck and squaring his body with
the window.  Holloway proposes that, if the tip was not fabricated, Ward would
have positioned himself at the vehicle's B-pillar (behind the driver's seat) when
conducting the traffic stop.

Under the law, the government's "legitimate and weighty interest" in officer
safety authorizes the police to order drivers and passengers out of their vehicles
at traffic stops without particularized suspicion.  See Rodriguez, 575 U.S. at 356
(citing Pennsylvania v. Mimms, 434 U.S. 106, 110–11 (1977); Maryland v.
Wilson, 519 U.S. 408, 413–415 (1997)).  Police officers may also direct people to
stay in their car with their hands up.  United States v. Bonner, 363 F.3d 213, 216
(3d Cir. 2004) (citing United States v. Moorefield, 111 F.3d 10 (3d Cir. 1997)). All
told, "a police officer executing such a stop may exercise reasonable
superintendence over the car and its passengers."  Id.

Holloway's argument presumes that reasonable police officers would never
walk up to a driver's side window when they suspect the driver has access to a
firearm.  That position ignores the realities of police work.  As for the relevant
testimony, Ward explained that he summoned Officer Benson from a nearby
patrol zone to act as his backup on the passenger side of the vehicle. (Doc. 42,
H.T. 43:23–44:9).  With Benson there on scene, Ward "wasn't in need of

43

anybody else present." Id. at 47:12-19.  Furthermore, Ward explained his approach to this traffic stop as follows:

> I don't want to give him the advantage, as I'm conducting my interdiction stop, I just want him to know I'm pulling him over for the motor vehicle violation, so I have the ability to ask him questions without him having a preset answer that he already developed in his head, if he knows I'm pulling him over for a specific interdiction reason.

Id. 49:16–23.

At the beginning of their interaction, Ward's bodycam shows Holloway holding his license and registration card near the driver's side window. (Doc. 43, Gov. Ex. #2, Ward BWC at 2:09-2:19).  Based on the angle of the bodycam, the video does not confirm whether Ward could see Holloway's other hand.  Ward also approached with a "what's up, buddy?" and an apology for not promptly making his way toward the defendant's vehicle. Id.  To the extent that Ward testified that he wanted to throw the defendant off the real reason for the stop, there is no *per* se rule against his approach when a traffic stop is justified by a vehicle infraction.  Rather, the law disregards an officer's pretextual explanations under these circumstances. See Mosley, 454 F.3d at 252.  Furthermore, the law concerning traffic stops gives police officers some Fourth Amendment leeway to better their odds in an armed or unarmed confrontation.  The law, however, does

not prevent officers from taking their chances.[12]  Ward's approach to this traffic stop does not weaken his credibility.

In sum, Holloway provided various arguments attempting to cast doubt on the legitimacy of the informant and the tip.  None compel the court to conclude that Ward fabricated the tip as a post-hoc reason to justify the defendant's extended detention.  Ward is credible.  Likewise, Officer Benson and Sergeant Navarro testified credibly.  Collectively, their testimony matches up with the details the court observed in the video footage.

### 3. Determining the <u>Rodriguez</u> Moment

Having addressed Ward's veracity regarding the tip, the court can finally turn to applying the law to the facts of this case.  Although Holloway's December 26, 2023 traffic stop was lawful at its inception, the court must consider whether it was unreasonably extended in violation of his Fourth Amendment rights.  <u>See</u> <u>Green</u>, 897 F.3d at 179 (citing <u>Caballes</u>, 543 U.S. at 407)).  Under <u>Rodriguez</u>, "an unlawful seizure occurs when an officer (1) diverts from the infraction-and-safety-based mission of the stop to investigate other criminal conduct, (2) in a

---

[12] Holloway also criticizes Ward's decision not to tell Sergeant Navarro, the narcotics dog handler, about the possibility of a gun in the vehicle.  (Doc. 45, Post-Hearing Br. at 2-3).  At this point of the stop, however, Ward had already ordered the defendant out of the vehicle and conducted a pat-down.  Defendant had also emptied his pockets.

way that meaningfully prolongs the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion." Ross, 151 F.4th at 496.

The Rodriguez analysis thus proceeds in two steps:  First, the court determines "the moment when the stop was measurably extended," i.e., the "Rodriguez moment." United States v. Stewart, 92 F.4th 461, 467 (3d Cir. 2024) (citing Green, 897 F.3d at 179).   Second, the court determines "whether the facts available to the officer up to that moment established reasonable suspicion of criminal activity." Id.

Holloway's proposed Rodriguez moment has recently moved up to an earlier point in the traffic stop.  Initially, defendant proposed the moment of extended detention somewhere around the ten-minute mark of Officer Ward's bodycam footage. (Doc. 28 ¶¶ 7–9; Doc. 45 at 1).  That is, Holloway demarcated a line after Ward had asked numerous questions of the defendant, returned to his patrol car to call for a narcotics dog, reviewed defendant's criminal record on his police laptop, and then returned to the defendant's vehicle to ask him additional questions about that record. Id.  The government takes the position that this point in the bodycam video may be fairly presumed to be the Rodriguez moment. (Doc. 46 at 7).  Thus, the court went into detail about the first ten minutes of the stop in the background section above.

Nonetheless, in his most recent brief, Holloway shifted his proposed Rodriguez moment to an earlier point just after Ward had received information from a county comm-center operator that the defendant's license and registration were valid. (Doc. 47 at 2 ("The mission of the stop was completed by 3:41:47")). As discussed next, the measurable extension of the traffic stop did not occur at either of the two points highlighted by the parties.

An officer's authority to seize a person during a traffic stop ends when tasks tied to the moving violation or traffic infraction "are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354 (citation omitted). The tolerable duration of police inquiries in this context are determined by the seizure's 'mission,' i.e., addressing the traffic violation that warranted the stop and attending to related officer safety concerns. See id. (citations omitted).

Under the law, "on-mission tasks include 'ordinary inquiries incident to [the traffic] stop,' such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.' " Ross, 151 F.4th at 495 (quoting Rodriguez, 575 U.S. at 355; Caballes, 543 U.S. at 408). Questions about the traffic infraction and context-framing inquiries about the driver's travel history and plans are also constitutionally permissible. Id. at 497. Additionally, "fleeting" off-mission inquiries lasting "mere" seconds "will not measurably prolong the stop." Id. at 495

47

(citation omitted).  "As more seconds tick by, however, the risk of unlawful prolongation increases." Id.

In this case, Officer Ward posed many infraction-related questions to Holloway in the first few minutes of the stop, including queries related to defendant's actual residential address.  (Doc. 43, Gov. Ex. #2, Ward BWC at 2:20-2:42).  After conducting a tint-check and explaining to Holloway that his driver's side window was "way too dark," Ward asked:

1. "Have you ever been pulled over before?"
2. "Never been stopped for the window tint?"
3. "You ever been cited for anything?

Id. at 3:11-3:20.  Holloway responded by communicating that he had never been pulled over for vehicle tint. Id.

The prohibition on tinted plate covers at 75 PA. CONS. STAT. § 1332(b)(5) took effect approximately one year before this traffic stop.  See Commonwealth v. Cahill, 324 A.3d 516, 524 (Pa. Super. Ct. 2024); PA LEGIS 2022-112, 2022 Pa. Legis. Serv. Act 2022-112 (H.B. 1486), § 10(4) (Purdon's).  At the suppression hearing, Ward explained that "he would be curious if he's driving from the Philadelphia area, if he hasn't been stopped for the window tint or the tinted-out plate cover." (Doc. 42, N.T. at 50:12-18).  Accordingly, even if the above questions come close to asking the defendant about his criminal history

when transcribed, they relate to the observed Vehicle Code violations in the context of the stop.  They are infraction-related inquiries.

Following the above questions, Ward directly asked about the defendant's arrest record, but did not follow up. (Doc. 43, Ward BWC at 3:20-3:25).  Pursuant to Ross, however, "brief, direct questioning about the driver's past arrests [or] criminal record" are considered safety-related inquiries when those questions are asked prior to a criminal history check. 151 F.4th at 497.  This five-second back-and-forth passes constitutional muster.

Subsequently, a radio transmission advised Ward that Holloway's registration was valid. (Doc. 43, Ward BWC at 3:25-3:28).   This is where Holloway proposes his earliest Rodriguez moment.  The court disagrees.

Rather, Holloway had presented Ward with a driver's license listing a Scranton address and a registration card listing a Brookhaven address.  So, Ward switched back to questions addressing that discrepancy and then radioed for a check of defendant's driver's license. Id. at 3:25-3:50.  Such questions relate to sections of the Pennsylvania Vehicle Code. See 75 PA. CONS. STAT. §§ 1312, 1515(a) (requiring drivers to update their address with the Pennsylvania Department of Transportation when it changes).  Hence, this is an on-mission task. See Rodriguez, 575 U.S. at 355; Caballes, 543 U.S. at 408.

Thereafter, a follow-up question about Brookhaven's relative distance to Philadelphia is a context-framing inquiry about the defendant's travel history and plans.  In the flow of questions, Ward immediately asked more questions about where Holloway was traveling from.  See Ross, 151 F.4th at 497.  Based on Holloway's imprecise explanations about his travel plans, it would be reasonable for follow-up questions.  (Doc. 43, Ward BWC at 4:09-4:20).

Ward, however, preferred a circling-back method of roadside interrogation, returning to "brief, direct questioning about [Holloway's] past arrests, criminal record, [and] 'parole status' " at the two-minute mark of roadside questioning, or approximately 4:20 in the video footage. Ross, 151 F.4th at 497 (citations and explanatory parentheticals omitted).  The following is audible on Ward's bodycam in the next twenty-five seconds of the encounter:

| **Ward:** | When was the last time you got arrested? |
|---|---|
| **Holloway:** | 2014. |
| **Ward:** | Oh, wow. Did you do state time or anything? Or county time? |
| **Holloway:** | It was a violation. |
| **Ward:** | Oh, for like probation?" |
| **Holloway:** | *[talking over Ward]* I had a DUI years ago. |

(Doc. 43, Ward BWC at 4:20-4:44).

In the above sequence, Officer Ward jumped from a question about defendant's last arrest to a question about where the defendant did his prison time. This style of questioning may lead to answers that create the need for an officer to ask more clarifying questions. But Ward did not seek clarity on this topic immediately. In the midst of the above exchange, the dispatcher radioed to Ward: "Ok, on Holloway, it's all valid." Id.

Consequently, Officer Ward turned to more direct questions about guns and drugs in the car. In this series of rapid-fire questions, Ward asked about weapons, knives, and firearms in the vehicle. Ward also asked if Holloway had anything illegal in the vehicle. Id. at 4:47-5:06. "[D]epending on the facts of a stop, a question that appears off mission on its face may in fact promote safe completion of the stop and thus relate to the stop's mission." Ross, 151 F.4th at 498. The above questions, in context, relate to officer safety. The next question, however, does not.

Specifically, at 4:52 in the bodycam footage, Officer Ward asked Holloway if he had any marijuana in his vehicle. When the defendant answered that he didn't smoke, Ward next asked whether defendant smoked cigarettes. In certain contexts, questions about marijuana may supply a plausible Rodriguez moment. United States v. Jones, No. 24-1558, 2025 WL 572389, at *3 (3d Cir. Feb. 21, 2025), cert. denied, No. 24-7361, 2025 WL 2824018 (U.S. Oct. 6, 2025). This is

one of those cases.  In the absence of any reasonable, objective explanation from Officer Ward at the suppression hearing about these questions, the only plausible reason he would follow-up his question about smoking marijuana with a question about smoking cigarettes would be to gauge whether defendant's vehicle had any odors that would interfere with a canine sniff.

"[T]he Rodriguez rule is far easier to articulate than to apply." Green, 897 F.3d at 179.  After review, however, all of Ward's questions moving forward further demonstrate a shift in the mission to a drug investigation, either trying to get the defendant to confess or say enough contradictory things to bolster an affidavit of probable cause for a search warrant.  After this point in time, Officer Ward kept circling back to Holloway's travel plans, his criminal history, and whether the vehicle contained anything illegal.  In other contexts, these questions might have been related to the infraction or geared toward officer safety, however, Ward's questions were repetitive and probing of areas not tied to the traffic stop.  Ward's methods of interrogation mixed direct confrontation with attempted rapport-building. The frequent topic changes appear designed to derail Holloway's train of thought.  "[W]hen officer questioning leaves the safety lane and merges into investigative territory, that lane switch requires independent reasonable suspicion." Ross, 151 F.4th at 502.  In this case, Ward signaled his lane change when he asked Holloway about marijuana.

### 4. Whether Ward Had Independent Reasonable Suspicion to Go Off-Mission

After setting the <u>Rodriguez</u> moment, the court must next determine "whether the facts available to the officer up to that moment established reasonable suspicion of criminal activity." <u>Stewart</u>, 92 F.4th at 467 (citing <u>Green</u>, 897 F.3d at 179). For the reasons set forth below, Officer Ward had reasonable suspicion to prolong the traffic stop and conduct a drug investigation.

"Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." <u>Kansas v. Glover</u>, 589 U.S. 376, 380 (2020) (citing <u>Navarette v. California</u>, 572 U.S. 393, 397 (2014); <u>Sokolow</u>, 490 U.S. at 7). Courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. <u>United States v. Arvizu</u>, 534 U.S. 266, 273, (2002) (citation omitted)). "To be reasonable is not to be perfect[.]" <u>Heien v. North Carolina</u>, 574 U.S. 54, 60 (2014).

#### A. Ward's Observations Considering His Training and Experience

In the reasonable suspicion calculus, officers can "draw on their own experience and specialized training to make inferences from and deductions

53

about the cumulative information available to them that 'might well elude an untrained person.' " Arvizu, 534 U.S. at 273 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)) (further citation omitted).

Officer Ward testified that he is a member of the Luzerne County Drug Task Force. (Doc. 42, H.T. at 37:5-8). He received drug interdiction training through the city police department and the task force. Id. at 37:23–38:5. Such training included courses regarding traffic stops and identifying criminal behavior, including how people involved in drug trafficking networks operate. Id. at 37:23–38:5, 121:20-25.

Dark window tint and obscured license plates can help establish reasonable suspicion that the vehicle contains drugs or other contraband. Stewart, 92 F.4th at 469. In this case, Holloway's "tinted out" vehicle raised Ward's suspicion due to his experience as a patrol officer and member of a drug task force:

> A lot of times, people involved in a variety of criminal activities will tint out their cars, especially, if they're traveling long distances, if they're going through turnpike tolls, any type of Pay By Plate, because the tinted out plate cover could obstruct that plate and make it unreadable. They're trying to conceal themselves in the vehicle, as they're passing police units, making it harder for us to do surveillance on them or see who is, actually, in the vehicle.

Id. at 54:16–55:1.

Furthermore, a driver's vague answers about travel plans can reasonably contribute to an officer's suspicion. Stewart, 92 F.4th at 469   During Ward's questioning on scene, Holloway explained his itinerary, that is, from Brookhaven through Wilkes-Barre by way of an auto shop in Sugar Notch on the way to Scranton to pick up his son and back to Brookhaven.  Per the officer, Holloway's route did not add up.   If Holloway really was going from Sugar Notch to Scranton, he passed two on-ramps for Interstate 81 at the point of the traffic stop. (See Doc. 42, H.T. at 52:6-15).  In Ward's training and experience, drug traffickers take city routes instead of interstate routes since "city cops just tend to be more busy with responding to calls" and do not "have the free time to run drug interdiction." Id. at 52:16–53:2.  During the traffic stop, Holloway never mentioned a destination in Wilkes-Barre, a reported accident, or post-Christmas traffic volume on the highway. [13]  The quickest, most-direct route from Sugar Notch to Scranton does not include surface streets through the City of Wilkes-Barre. "Though not strictly contradictory or logically irreconcilable," Holloway's answers

---

[13] In one of Holloway's pre-hearing briefs, he explained that he had decided to make a deposit at a Chase Bank in Wilkes-Barre "to deposit the cash police seized from him into the bank." (Doc. 36 at 5).  This testimony did not come out at the hearing.  At no point during the encounter did Holloway tell Ward that he had a stop to make in Wilkes-Barre on his way to Scranton.  According to a review of the bodycam footage, the police also let Holloway walk away from the scene with a rubber-banded stack of currency at the conclusion of the traffic stop.

about his travel plans "were sufficiently confusing to provoke reasonable suspicion." See Stewart, 92 F.4th at 469 (citing Green, 897 F.3d at 185).

Additionally, prior to asking Holloway if he had marijuana or other drugs in the vehicle, Ward can be observed turning his head away from Holloway to stare at someone or something at the end of the block.  In his testimony, Ward explained that he spotted two males standing in the street "that seemed very interested in what was going on." Id. at 55:18-23.  After the Rodriguez moment in this case, Ward directly asked the defendant if he knew them.  Holloway answered in the negative.

Officer Ward explained that, through his training and experience, people moving narcotics or weapons use lead vehicles or follow vehicles to "monitor the situation" in case the main transport vehicle gets stopped by police.  Id. at 56:24–57:56.  Ward also explained that these onlookers remained near the scene for an extended period.  The onlookers continued to be a point of conversation between Ward and Officer Benson as they worked through the rest of the investigation. (Doc. 43, Ward BWC at 28:41-29:16).  Ward documented these individuals using his bodycam.  Id.  They can be observed until after Holloway departed from the scene in their direction. Id. at 38:00-39:11. Although more details about these onlookers are revealed after the Rodriguez moment, Ward picked up on their presence prior to the dividing line in this case.  Based on his experience,

56

onlookers appearing to be particularly interested in a traffic stop could be reasonably considered by Ward under the totality of the circumstances approach to reasonable suspicion.

Ward also testified that he observed Holloway's nervous behavior throughout the stop.  Such cues included shaking.  Other behaviors included "avoiding eye contact [and] refusing to even look at" the police, according to Ward's testimony. (Doc. 42, H.T. at 115:17-23).

Ward's hearing testimony distinguished "slight nervousness" from "excessive nervousness" — criteria refined through the officer's training and "hundreds" of traffic stops. Id. at 121:8–122:2.  According to Ward, "general nervousness" would not hold any significance to him at a traffic stop. Id. 123:23–124:5.  As for Holloway, Ward testified that defendant's nervousness was "excessive," and "an indicator of criminal activity." Id. at 122:1-2, 123:18-22. Much has already been written about Ward's descriptions of Holloway's nerves, but in the reasonable suspicion calculus, the defendant's nervousness plays a contributing factor.

### B. Corroboration of The Tip

The tip from the confidential informant also plays an important role in the reasonable suspicion analysis.  An officer's reasonable suspicion depends on the "information possessed by police and its degree of reliability." White, 496 U.S. at

57

330.  The court has detailed the nature of the tip above, determining that it was not an officer fabrication.  Although the tip in this case was real, it must be reliable to serve as a basis for the officer's reasonable suspicion.  See Johnson, 592 F.3d at 449.  The Third Circuit has identified five specific factors that indicate reliability for tips:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation;
>
> (2) The person providing the tip can be held responsible if his allegations turn out to be fabricated;
>
> (3) The content of the tip is not information that would be available to any observer;
>
> (4) The person providing the information has recently witnessed the alleged criminal activity; and
>
> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility.

Id. (citing Torres, 534 F.3d at 211).

"Though these factors all are relevant to [the] analysis, no single factor is dispositive or even necessary to render an informant's tip reliable," and the court must look again "to the totality of the circumstances to determine" if informant information had "sufficient indicia of reliability" in deciding whether an officer possessed "objectively reasonable suspicion[.]" See id. (applying the above

58

factors to determine whether an informant tip supplied reasonable suspicion as the basis for the stop).

In this case, the first two factors are not on the government's side. Officer Ward did not meet the confidential source face-to-face and could not recall whether he received the information through a phone call or a text message. The confidential source also faced no consequences if the tip turned out to be false. Ward testified that his source had not been signed up as a confidential informant through the county drug task force. There was also no testimony in this case that Ward's source was seeking a reduction of pending criminal charges or a pending sentence through cooperation. Ward did not disclose any ramifications if his confidential source provided a false tip.

The remaining factors collectively weigh in favor of reliability. Regarding the third factor, the source provided information to Ward that would not be known by any casual observer. That is: the tip included information that the driver of a black GMC Sierra would be named Leo; Leo would be a convicted felon; and Leo would have a gun and a large quantity of narcotics in the vehicle. All of the identification details checked out quickly. The details about drugs and a gun allegedly checked out upon the execution of a search warrant.

Regarding the fourth factor, recent witness of alleged criminal activity, Holloway is accused of possession with intent to deliver certain illegal drugs

59

along with gun offenses.  The source relayed information about the alleged gun possession and drug trafficking no more than an hour and a half before the traffic stop.  There is no testimony that Officer Ward's confidential source directly observed the alleged criminal activity.

Ward testified, however, that the informant was a reliable identification resource.  Informants and sources used by the police need not be infallible and their reliability may be bolstered by accurate predictions. See Gates, 462 U.S. at 245–46 & n. 14 (1983); see also United States v. Nelson, 284 F.3d 472, 483 (3d Cir. 2002) ("In Gates, the Court recognized that when an informant has been shown to be right about some things, he is probably right about others, including the alleged criminal activity."). According to Ward, about one month before defendant's traffic stop, the confidential source had assisted the Pennsylvania State Police, through Ward, with their investigation into a shooting death at an adult entertainment club.  The source, per Officer Ward, identified individuals involved or at the club at the time of the homicide.  On that same note, Ward did not disclose any "bad tips" from his source, only bits of information that he could not follow up on due to his own work schedule or limitations.  Thus, Ward's confidential source had at least one prior instance, within Ward's knowledge, of accurately identifying people of interest to the police.

The level of identifying details supplied to the officer relative to this case suggest that, at bottom, the informant had connections to the defendant and knew the reasons defendant would be traveling on the streets of Wilkes-Barre. Based on the details supplied to Officer Ward about identification of the person that turned out to be Holloway, such as the defendant's first name, the exact make, model, and color of his vehicle, and his road of travel in the city, the confidential source may not have observed the alleged crimes being committed, but that individual came close enough for this factor to be weighed in favor of reliability.

Additionally, "predictiveness," the last factor, weighs in favor of reliability. In this case, the confidential source provided such predictive information that it prompted the defendant to lead with the too-good-to-be-true arguments addressed above.

Based on Ward's credible testimony, the real question in this case is whether the tip was true enough to be good. To reiterate, Ward corroborated most of the tip within the first few minutes of the stop. The vehicle matched the informant's description: a "tinted-out" black GMC Sierra. The driver's route of travel, on Hazle Street, matched the tip. The driver provided Ward with a license and registration card identifying the person at the wheel as Leo, just as the tip predicted. Holloway answered questions about his prior arrests in a way

61

indicating that he had last encountered the law for a DUI-related probation or parole violation.  This provided Ward, or any reasonable officer, the ability to identify the defendant as a convicted felon or possible convicted felon before the Rodriguez moment.  That information also matched up with the tip provided by the source.  All that remained for Ward to do is establish probable cause to look for the suspected drugs and gun within the defendant's vehicle as the tip further provided.

"After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003).  Based on the totality of the circumstances, Officer Christopher Ward of the City of Wilkes-Barre Police Department possessed reasonable suspicion when he began asking Defendant Leo Holloway questions designed to further an investigation into the crimes that the defendant is accused of committing in the indictment.  Holloway's motion to suppress will thus be denied.[14]

---

[14] Holloway raised other grounds in his initial motion to suppress that he seems to have abandoned in light of the evidentiary hearing and subsequent briefing.  For example, defendant argued initially that Ward made him exit the vehicle and empty his pockets for no valid reason. (Doc. 28 ¶¶ 10–13).  Ward could have ordered Holloway out of the car for any reason under Mimms.  Additionally, at the rear of his vehicle, Holloway kept reaching into his

**Conclusion**

For the reasons set forth above, Defendant Leo M. Holloway's motion to suppress will be denied and this matter will be listed for trial. An appropriate order follows.

Date: 10/21/25

_____
JUDGE JULIA K. MUNLEY
United States District Court

---

pockets even after being told not to so by the officers. Ward asked for permission to empty Holloway's pockets. Holloway voluntarily emptied them himself.

Holloway further argued that the narcotics dog, Zeus, was unreliable. (Doc. 36 ¶ 10). However, Sergeant Navarro, the dog's handler, testified to the extensive training and certifications that he and Zeus had prior to the stop, supporting Zeus's positive alert in this case. (Doc. 42, N.T at 7:19–12:9). "A dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car without a warrant." United States v. Pierce, 622 F.3d 209, 213 (3d Cir. 2010). "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." Florida v. Harris, 568 U.S. 237, 246–47 (2013). Ward chose to impound the truck pending a warrant application. Consequently, these ancillary arguments, raised but not fully argued, do not justify suppression.